Wanda **FRANCOIS**

v.

**COMMISSIONER OF SOCIAL SECURITY.**

No. Civ.A. 00–0089.

United States District Court,
E.D. Louisiana.

March 29, 2001.

---

William S. Vincent, Jr., Law Office of William S. Vincent, Jr., New Orleans, LA, for plaintiff.

Kathryn Weekley Becnel, Orelia E. Merchant, U.S. Attorney's Office, New Orleans, LA, for defendant.

## ORDER AND REASONS

CHARLES SCHWARTZ, JR., District Judge.

Before the Court are cross motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. These motions were submitted on the briefs. Having reviewed the motions, memoranda, exhibits/administrative record, and the applicable law, and for the reasons detailed herein below, this Court REMANDS the captioned matter for further consideration consistent with the opinions expressed herein below.

## I. Procedural Background

Plaintiff/claimant, Wanda Francois (Francois), seeks judicial review pursuant to Section 405(g) of the Social Security Act (the Act) of the final decision of the Commissioner of the Social Security Administration (SSA), denying her claim for supplemental security income benefits under Title XVI of the Social Security Act, 42 U.S.C. § 1382c(a)(3), and finding the claimant was not under a "disability," as defined in the Act, at any time through the date of decision.[1]

On October 26, 1995, Francois applied for supplemental security income benefits under Title XVI of the Act, alleging disability since December of 1988,[2] due to migraine headaches and asthma.[3] Following initial denial[4] the claimant filed a timely request for a hearing, disagreeing with the initial determination on the basis of her dizziness, headaches, numbness on her left side, blurred vision, and the fact that her medications provide no relief.[5] Following the denial of her request on reconsideration,[6] claimant filed her request for hearing before an Administrative Law Judge, claiming that her condition had gotten so bad that she could not function and that she had dizziness and felt faint every day.[7] The hearing was conducted on December 2, 1997, and the claimant was represented by counsel,[8] before United States

---

1. *See* March 27, 1998 Decision of ALJ Jimmy N. Coffman denying benefits [Administrative Record (Adm.Rec.), 10–20].

2. It is noteworthy that in the subject application, Francois claims "disability" December 1, 1988, yet she was previously determined not to be "disabled" in an April 27, 1993 decision of ALJ Clement Kennington. In her earlier application, claimant complained of essentially the same allegedly disabling conditions (*i.e.*, headaches, blurry vision, numbness, and asthma). The April 27, 1993 decision, which determined that Francois was not entitled to disability, disability insurance benefits, or supplemental security income, was affirmed by the Appeals Council in August of 1993. *See* ALJ Kennington's April 27, 1993 Decision [Adm.Rec. 40–47/Exh. B1]; and August 31, 1993 Action of Appeals Council on Request for Review [Adm.Rec. 49–50/Exh. B3]. .

3. *See* October 26, 1995 Application for Supplemental Security Income [Adm.Rec. 61–62]; and October 26, 1995 Disability Report [Adm. Rec. 66/Exh. B6].

4. *See* November 14, 1995 Notice of Disapproved Claim [Adm.Rec. 56].

5. *See* Request for Reconsideration [Adm.Rec. 55].

6. *See* December 15, 1995 Notice of Reconsideration, finding the prior determination proper [Adm.Rec. 52].

7. *See* January 9, 1996 Request for Hearing [Adm.Rec. 51/Exh. B4].

8. *See* Transcript of December 2, 1997 Hearing [Adm.Rec. 22–37].

Administrative Law Judge (ALJ) Jimmy Coffman.[9] The claimant, a high school graduate, was 37 years old at the time of the hearing and her previous employment as a tobacco packer ended in 1988. [Adm. Rec. 25,26,70]. As previously mentioned, on March 27, 1998, the ALJ issued a decision finding that the claimant was not "disabled" within the meaning of the Act and denying her application for supplemental security income.[10]

On request for review,[11] the Appeals Council concluded that there was no basis in the regulations for granting the request for review, noting that the contentions raised by claimant provided no basis for changing the ALJ's decision.[12] On February 15, 2000, Francois filed the instant complaint seeking judicial review of the final decision of the Commissioner denying her application for supplemental security income.[13] The decision is ripe for judicial review. As previously mentioned, Francois and the Commissioner filed cross-motions for summary judgment arguing that issues are amenable to summary disposition as a matter of law based on the record and the applicable law.[14]

## II. ALJ's Findings

The ALJ first noted that although claimant alleges that her disability began on December 1, 1988, the real issue is whether the claimant was under a disability on October 26, 1995, her protective filing date, inasmuch as no benefits are payable under Title XVI for periods which pre-date the filing of an application.

The ALJ's findings are excerpted herein below:

1. The claimant has not engaged in any substantial gainful activity since October 26, 1995, the date she filed her application. 20 C.F.R. §§ 416.910 and 416.972.

2. The **medical evidence establishes that the claimant has severe chronic headaches**[15] and a history of abdominal pain, but that she does not have an impairment or combination of impairments that are listed in, or that equal in severity an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. The evidence also establishes that the claimant has a history of asthma which has been well-controlled by

9. *See* Notice of Hearing and Acknowledgment [Adm.Rec., 91–91]; Transcript of January 16, 1998 Hearing, at which Claimant, accompanied by counsel, and Vocational Expert, Katrina Verden, appeared and testified [Adm. Rec., at 23–76].

10. *See* ALJ's March 27, 1998 Decision denying supplemental security income [Adm.Rec., at 11–18]; and Notice of Unfavorable Decision [Adm.Rec. 7].

11. *See* April 6, 1998 Request for Review of the Hearing Decision [Adm.Rec. 5–6].

12. *See* November 19, 1999 Action of Appeals Council on Request for Review [Adm.Rec., at 2].

13. *See* Complaint filed February 15, 2000 [Fed.Rec.Doc.No. 1].

14. *See* Plaintiff's Motion and Memorandum in Support of Motion for Summary Judgment [Fed.Rec.Doc.No. 15]; and Defendant's Reply Memorandum of Facts and Law [Fed.Rec. Doc.No. 19]. There has been no request for oral argument and in any event, having reviewed the record in its entirety, the Court believes that such argument is unnecessary and would not assist the Court in the disposition of the matter, and thus it is deemed submitted for decision.

15. The ALJ noted "claimant's history of treatment for headaches" and that "her primary complaints" since the filing of her current application for benefits "have dealt with her headaches." [Adm.Rec. 11].

medication at all time relevant to this decision and is therefore not found to be a "severe" impairment within the meaning of the Act.

3. The claimant has an underlying medically determinable impairment which could reasonably cause the symptoms alleged; however, based on the evidence in its entirety, the claimant's testimony was not credible [16] or reasonably supported by objective medical evidence, or inferences therefrom, to the extent that she is completely unable to perform any work activity. 20 C.F.R. § 416.929; SSR 96–7p.

4. The claimant has the residual functional capacity to perform the exertional and nonexertional requirements of work activity except for the inability to engage in activities inconsistent with sedentary work. 20 C.F.R. § 416.945.[17]

5. The claimant has the residual functional capacity to perform a full range of sedentary work. 20 C.F.R. § 416.967.[18]

6. The claimant is unable to perform her past relevant work as a packer, as it entails exertional effort greater than that which the claimant is capable of performing.

7. The burden has been shifted to the Commissioner to show that there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medically determinable impairments, particular functional limitations and relevant vocational characteristics.

8. At the time she filed her application, claimant was 35 years old, which is defined as a younger individual. 20 C.F.R. 416–963

9. The claimant has a 12th grade education. 20 C.F.R. 416.964.

10. The claimant has not acquired any work skills that are transferable to

---

**16.** Notwithstanding his finding that "the claimant does have pain causing some functional limitations," the ALJ went on to conclude that the claimant's complaints were only "partially credible" and that she "exaggerated the nature and severity of her subjective complaints" in asserting that "she is unable to engage in any work activity." [Adm. Rec. 15–17]. At no point in the decision does the ALJ ever define, describe, or otherwise explain what he perceives are the claimant's functional limitations, due to the chronic pain she suffers from migraine headaches, *inter alia*. His credibility assessment is premised on the following findings: (1) "no objective medical evidence of any seizure disorder;" (2) absence of a "definitive diagnosis which accounts for her reported abdominal pain;" (3) a "clinical diagnosis ... of mixed type headaches (tension/muscle contraction as well as migraine)," which fails to "draw a distinction between the severity of symptoms reported with each;" (4) "no clinical corroboration of neurological deficits" associated with the headaches alleged by the claimant; (5) no

more than "sporadic medical treatment"; and (6) no corroboration in the medical records of "claimant's complaints of side effects of her prescribed medications, including drowsiness." [Adm.Rec. 17]. The ALJ further notes that Ms. Banks, who testified at the hearing, failed to provide assistance in determining the credibility of the claimant's subjective complaints. *Id.*

**17.** The sole premise of this finding is the *absence of* "objective medical evidence" which establishes that "the claimant suffers from any condition which would adversely affect her ability to sit, stand, walk, and lift or carry objects in a manner consistent with the definition of sedentary work." *Id.*

**18.** The ALJ explained that **"objective evidence** fails to establish that the claimant has any significant restrictions in her residual functional capacity [to perform a full range of sedentary work], despite her subjective complaints." [Adm.Rec. 18].

other skilled or semi-skilled occupations. 20 C.F.R. 416.968.

11. Because the claimant's exertional and nonexertional residual functional capacity and relevant vocational factors coincide exactly with a Rule on the Medical–Vocational Guidelines of 20 C.F.R. Part 404, Subpart P, Appendix 2, I shall use the Guidelines to direct the ultimate decision in this case. *Heckler v. Campbell,* 461 U.S. 458, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983); 20 C.F.R. § 416.969.

12. Considering the claimant's residual functional capacity and relevant vocational characteristics, Guideline Rule 201.27 directs the conclusion that she is not disabled.

13. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision. 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 416.920(f).[19]

### III. Statement of Issues on Appeal

Francois' request for judicial review argues that the Commissioner's decision, given the record as whole, is not based upon "substantial evidence." Specifically, the claimant alleges error in the following particulars: (1) error in determining claimant's residual functional capacity; (2) error in determining that claimant had exertional impairment/s that precluded more than sedentary work activity; (3) error in the determination that claimant could perform a full range of sedentary work; (4) error in rejecting all non-exertional impairments as having little impact on the claimant's ability to perform sedentary work; (5) error in failing to obtain the services of a vocational expert after determining plaintiff's impair-

ment was chronic pain due to migraine headaches—a non-exertional impairment; (6) thus, erroneous application of the Grid Regulations considering the presence of non-exertional impairments; and (7) error in that the residual functional capacity (RFC) assessment was unsubstantiated by the evidence.

Essentially the claimant argues that residual functional capacity (RFC) is a medical assessment, and that ALJ's conclusion placing her in the sedentary work category was not based on any positive medical finding that the claimant could perform sedentary work. Rather, the conclusion is based on the absence of any notation regarding limitations in the claimant's MCLNO treatment records. The Commissioner countered that the ALJ's duty to inquire does not demand a consultative examination at government expense unless the record establishes that such an examination is required to allow the ALJ to make an informed disability decision. The Commissioner's position is that the record contained sufficient medical and non-medical evidence upon which to base its determination, and it was within the ALJ's discretion not to order a medical assessment of the claimant's residual functional capacity (RFC).

Claimant further argues that since the ALJ determined that claimant's chief impairment was non-exertional (i.e., chronic migraine headache pain), he was required to obtain the services of a vocational rehabilitation expert (VE). In short, the claimant contends that under the circumstances it was error to simply resort to the Grids to establish that there were a sufficient number of jobs in the national economy that the claimant could perform. Claimant argues that the ALJ's rationale is deficient and fails to specifically cite the impairment

---

19. See March 27, 1998 Decision of the ALJ [Adm.Rec. 11–20].

considered to be "severe" and fails to specify what restrictions/functional limitations the "severe" impairment placed on her RFC. In assessing RFC, claimant argues that the ALJ's conclusory statements concerning the claimant's abilities were not sufficient because his findings must specify the functions the claimant is capable of doing, and there was no real assessment in claimant's case. Essentially, it is the claimant's position that there was no medical assessment of the claimant's RFC in this case. None of the medical evidence addresses the claimant's functional restrictions, much less on account of pain, and it is claimant's position that without the testimony of a VE, the requisite "substantial evidence" to support the ALJ's finding that plaintiff was not disabled is lacking in this case.

As the foregoing argument, the Commissioner simply submits that because substantial evidence supports the ALJ's finding that the claimant could perform a full range of sedentary work, the ALJ properly relied on the grids and was not required to consult a vocational expert. In this vein, the Commissioner argues that other than headaches, the claimant herself did not advance any impediment to her ability to work/function. The Commissioner further notes that the medical records contain no indication that claimant has any limitation in her ability to stand, walk, or sit, all of which comprise the modest demands of sedentary work. Essentially, the Commissioner finds that the failure of claimant's treating physicians to address limitations is significant, and a reasonable inference is that she has none.

The Court notes that nowhere in his argument, does the Commissioner address the claimant's argument regarding the ALJ's complete failure to identify and define claimant's exertional and nonexertional limitations, after having found that such limitations exist. In this vein, the claimant points out that the ALJ made specific findings that; (1) "the claimant suffers from *severe chronic* headaches;" (2) the claimant "has a medically determinable impairment which could reasonably cause the [pain] symptoms alleged;" and (3) "the claimant does have pain causing some [non-exertional] functional limitations." The absence of any discussion of non-exertional limitations associated with migraine headaches pain and treatment were not only not discussed by the ALJ at all and cannot be gleaned from the raw medical data which comprises the medical record in this case. There is no medical assessment of RFC to be found in the record of this matter. It is the claimant's contention, that in conclusory fashion, the ALJ simply rejected the notion that the claimant's non-exertional impairments had any impact on the RFC assessment, and yet the record, including the ALJ's decision, is devoid of any discussion or definition of precisely what these non-exertional limitations are (*i.e.*, what restrictions claimant's "severe" impairment placed on her ability to engage in gainful employment). The only thing that is clear from the ALJ's decision is that he did not believe these unidentified restrictions were significant, and that decision based on the his assessment of the claimant as not fully credible and the absence of "objective medical evidence" which would support claimant's subjective complaints of disabling pain.

The balance of claimant's assignments of error concern the ALJ's evaluation of claimant's migraine headache impairment and the assessment of her lack of credibility to the extent she alleges debilitating headache pain. In that regard, the claimant further notes that the ALJ failed to discuss his rationale for dealing with the issue of pain as set out in 20 C.F.R. 416.929, SSR 96–7p. In this vein, claimant's counsel notes that the ALJ did not

address the effects of the claimant's prescription medications on her ability to function, found no neurologic deficits when the objective medical evidence revealed some sensory deficits including numbness, poor ability to heel/toe walk, etc., and finally, characterized the claimant's treatment as not more than sporadic, when the record clearly reflects that the claimant was seen on a regular continuing basis for severe and chronic migraine headaches, and was treated in the emergency room for that chronic condition in between appointments at MCLNO's Neurological Clinic.

The Commissioner submits that substantial medical evidence supports the ALJ's credibility assessments, which credibility determinations should be accorded deference. The Commissioner argues that the medical evidence when viewed as whole shows both that the claimant's condition was improving, and that the claimant had only infrequent and short-term headaches. In the Commissioner's view, such a situation could lead to the reasonable inference that the impairment would not significantly limit the claimant's ability to work. The Commissioner further argues that the fact that no physician mentioned any restrictions or limitations on account of the claimant's impairments constitutes significant evidence from which the ALJ could infer no significant exertional or nonexertional limitations existed.

The Commissioner submits that in addition, the absence of any finding of neurologic abnormality in claimant's treatment records, and two cryptic comments in claimant's treatment records early on, also argue its position that substantial evidence supports the ALJ's determinations regarding the claimant's lack of both credibility and disability.

## IV. Analysis

### A. Standards of Review

The function of this Court on judicial review is limited to determining whether there is "substantial evidence" in the record, as a whole, to support the final decision of the Commissioner as trier of fact, and whether the Commissioner applied the appropriate legal standards in evaluating the evidence.[20] *See* 42 U.S.C. § 405(g); *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir.1995); *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir.1993); *Carrier v. Sullivan*, 944 F.2d 243, 245 (5th Cir.1991); *Villa v. Sullivan*, 895 F.2d 1019, 1021(5th Cir.1990); *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir.1993).

"Substantial evidence" is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); and *Spellman*, 1 F.3d at 360. The evidence must be more than a scintilla but may be less than a preponderance. *Id.*

A district court may not try the issues *de novo*, reweigh the evidence or substitute its own judgment for that of the Commissioner.[21] *Ripley*, 67 F.3d at 555; *Spellman*, 1 F.3d at 360; and *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir.1990). It must, however, scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it.

---

**20.** This premise guides the Court's determination of the specific issues raised by the plaintiff in this case.

**21.** The Commissioner is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible. *See Arkansas v. Oklahoma*, 503 U.S. 91, 112 S.Ct. 1046, 117 L.Ed.2d 239 (1992).

*Anthony v. Sullivan,* 954 F.2d 289, 295 (5th Cir.1992); *Villa v. Sullivan,* 895 F.2d 1019, 1022 (5th Cir.1990); *Johnson v. Bowen,* 864 F.2d 340, 343–44 (5th Cir. 1988). Any of the findings of fact by the Commissioner that are supported by substantial evidence are conclusive. *Ripley,* 67 F.3d at 554.

## B. Entitlement Disability Benefits under the Act

To be considered disabled and eligible for disability benefits under the Act, the plaintiff must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability. 20 C.F.R. §§ 404.1501 to 404.1599 & Appendices, §§ 416.901 to 416.998 (1995). The regulations include a five-step evaluation process for determining whether an impairment prevents a person from engaging in any substantial gainful activity. *Id.* §§ 404.1520, 416.920; *Greenspan v. Shalala,* 38F.3d 232, 236 (5th Cir.1994); *Moore v. Sullivan,* 895 F.2d 1065, 1068 (5th Cir.1990).[22] The five-step inquiry terminates if the Commissioner finds at any step that the claimant is or is not disabled. *Leggett v. Chater,* 67 F.3d 558, 564 (5th Cir.1995).

The claimant has the burden of proof under the first four parts of the inquiry. *Id.* If he successfully carries this burden, the burden shifts to the Commissioner to show that other substantial gainful employment is available in the national economy, which the claimant is capable of performing. *Greenspan,* 38 F.3d at 236; *Kraemer v. Sullivan,* 885 F.2d 206, 208 (5th Cir.1989). When the Commissioner shows that the claimant is capable of engaging in alternative employment, "the ul-

**22.** The five-step analysis requires consideration of the following:

First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled. 20 C.F.R. §§ 404.1520(b), 416.920(b).

Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled. *Id.* §§ 404.1520(c), 416.920(c).

Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled *per se* (i.e., without consideration of vocational evidence). *Id.,* 404.1520(d), 416.920(d).

Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated. If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled. *Id.* §§ 404.1520(e), 416.920(e).

Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education and work experience are considered to see whether he or she can meet the demands of a significant number of jobs in the national economy. If the claimant cannot meet the demands, he or she will be found disabled. *Id.* §§ 404.1520(f)(1), 416.920(f)(1). To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns. When the findings made with respect to claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled. *Id.* § 404, Subpt. P, App. 2, §§ 200.00–204.00, 416.969 (1994) ("Medical Vocational Guidelines").

timate burden of persuasion shifts back to the claimant". *Id.; accord Selders,* 914 F.2d at 618.

The Court "weigh[s] four elements of proof when determining whether there is substantial evidence of disability: (1) objective medical facts; (2) diagnosis and opinions of treating or examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) his age, education, and work history." *Martinez v. Chater,* 64 F.3d 172, 174 (5th Cir. 1995). "The Commissioner, rather than the courts, must resolve the conflicts in the evidence." *Id.*

### C. Medical Evidence.

The medical evidence consists of the records from the Medical Center of Louisiana at New Orleans (MCLNO) and emergency room reports from Mercy Hospital and the MCLNO. Claimant does not dispute that the chief basis for her alleged disability is her migraine headache condition and the associated pain. The focus of this Court's review of the claimant's medical records is therefore, the claimant's medical treatment associated with her migraine headache condition during the pertinent time frame.

On February 3, 1993, claimant visited the Neurology Clinic of the MCLNO and complained of having 2 headaches daily.

She was then taking **Pamelor 75 mg** and **Fiorcet** when needed. The doctor's impression was "chronic [headache] H/A," the plan included a change in medication to add **Calan SR (verapamil hydrochloride)** [23] 120 mg morning and night, increasing Pamelor [24] to 100 mg and the claimant was also instructed to keep a headache calendar and return for a follow up visit in two to three months. [Adm.Rec. 120].

Claimant returned for her follow-up reporting mild improvement with her headaches on Verapamil and Pamelor. The impression, chronic headaches, remained unchanged. However, the plan of management included **discontinuing Pamelor and Verapamil** and beginning **Prozac.**[25] The claimant was instructed to return for a follow up on August 31, 1993. [Adm.Rec. 120].

On August 31, 1993, claimant returned for her follow up visit in the Neurology Clinic and reported that Prozac made her mind out of control and so she quit taking them and **began taking Verapamil and Pamelor again.** Claimant stated she felt a decrease in her headache intensity and frequency on those medications. At that time she reported about **5 headaches a week, preceded by dizziness,** with throbbing on the top of her head, **blurry vision** and photophobia (*i.e.,* light increased her

---

23. **Calan SR (verapamil hydrochloride)** is a calcium ion antagonist which decreases systemic vascular resistance by dilating the main coronary arteries and arterioles and its major uses are for angina, arrythmias and essential hypertension. One of warnings associated with its use is a decrease in blood pressure below normal levels, which **may result in dizziness** or symptomatic hypotension. Other listed adverse reactions include nausea, fatigue and blurred vision. *See* Physician's Desk Reference (PDR), at 2983–84. (55th Ed.2001).

24. **Pamelor** (nortriptyline HC1) is prescribed for the relief of symptoms of **depression.** Adverse reactions include confusional states,

numbness, tingling, paresthesias of extremities, seizures, **nausea, abdominal cramps,** among others. *See* PDR, 2409–10 (51st Ed.1977); *see also In the Matter of Thirtyacre,* 36 F.3d 697, 699 (7th Cir.1994) (describing Pamelor as "**a powerful antidepressant drug**"); and *Plummer v. Apfel,* 186 F.3d 422, 434 (3rd Cir.1999).

25. **Prozac** is indicated for the **treatment of depression** which, as any psychoactive drug, **may impair judgment, thinking, or motor skills,** which issues physicians are advised to discuss with their patients. *See* PDR 55, at 1129.

headache intensity). The impression at that time was that the claimant's headaches were of the migraine type, common and classic. Prescription drug therapy in the planned management of the claimant's condition as of that visit included Inderal[26] daily, and Esgic–Plus[27] and Motrin 800mg between headaches. Verapamil and Prozac were discontinued. The claimant was told to return in 6 weeks. [Adm.Rec. 112].

Claimant returned for her follow-up on October 12, 1993 complaining of migraine headaches with aura of dizziness, blurry vision, and pain shooting on the left side of her head, beginning from behind the left eye. These pains complained of were occurring throughout the day, everyday, and she had to sleep off her headaches. Claimant's neurological exam was normal and no focal motor or sensory deficits were noted. The impression was headaches with both migraine and tension components. The plan as of that visit was continue with Pamelor, Inderal for prophylaxis, and the claimant was instructed to take Motrin and 2 Esgic for symptomatic relief at the onset of every headache, then one every 4–6 hours afterwards not to exceed 6 a day. Claimant was instructed to return in 3 months on January 25, 1994.

Claimant returned to the Neurology Clinic for her follow-up visit on January 25, 1994 for migraine headaches. At that time her headaches were occurring about once a week, heralded by an aura, and dizziness. The physician reported her condition as "classic migraine—intensity controlled, frequency not controlled." [Adm.Rec. 107]. He discontinued Inderal and put the claimant back on Calan SR (verapamil hydrochloride) and maintained her prior regimen of Pamelor, Motrin, and Esgic. Id. Claimant's follow-up examination on June 7, 1994 resulted in same diagnosis and continuing her medication regimen. The doctor indicated that her condition was responding favorably to Calan SR (Verapamil). The claimant was instructed to return in a year or when necessary. Her scheduled return visit to the Neurology Clinic was June 6, 1995.

However, claimant returned to the clinic December 13, 1994 and was again diagnosed with classic migraine. At the time, claimant was experiencing 15 headaches a month, almost daily, and according to the doctor, "gave a textbook description of her symptoms" and requested Esgic, stating that it was the only medication that stops her headaches. [Adm.Rec. 103]. The doctor noted that there was a possibility of dependence on Esgic and advised her to minimize use of that drug. The plan included restarting the claimant on Calan SR (Verapamil Hydrochloride).

On June 26, 1995 she returned to the Neurology Clinic and complained of her headaches occurring 2 to 3 times a week, each lasting a few hours. The

---

26. Inderal (Propanolol Hydrochloride) is indicated for the prophylaxis of the common migraine headache. Its efficacy in the treatment of a migraine attack, however, has not been established. Although most adverse reactions are reportedly mild and transient and rarely require withdrawal of therapy, they may include, inter alia, light-headedness, mental depression, weakness, fatigue, visual disturbances, short term memory loss, emotional lability, etc. See PDR 55, at 3378–79.

27. Esgic Plus is a combination drug containing butalbital (a short to intermediate-acting barbituate) acetaminophen and caffeine, which is prescribed for relief of symptoms of tension or muscle contraction headaches. The most frequently reported adverse reactions are drowsiness, dizziness, sedation, nausea, and abdominal pain. It is also habit forming and its extended use is not recommended. See PDR 51, at 1012.

physician noted, however, *she was able to attend classes and do daily chores.* **Her neurological exam was normal, her vision was 20/20 and 20/50, although she** *complained of blurry vision.* Her medication regime at that time included **Calan SR (Verapamil)** for migraine prophylaxis daily, **Esgic** as needed pain at onset, and **Pamelor** (an anti-depressant prescription medication) daily. The physician **diagnosed classic migraine and noted significant behavioral component** without any further explanation. [Adm.Rec. 95].

As of February 6, 1996, claimant's asthma was stable, and she was still being followed up for her headaches in the Neurology Clinic. Her medications included **Verapamil, Esgic, and Pamelor plus medications prescribed to control her asthma condition** (i.e., **Proventil and Aerobid**) [Adm.Rec. 91].

The claimant's **MCLNO June 18, 1996** chart note recounts her complaint of **continued experience of daily headaches.** The doctor noted, "? suspicion of rebound phenomenon,"—whatever that means. [Adm.Rec. 212]. Further noted is claimant's description of decrease in hearing on the left and **numbness** of the left arm associated with her headache. Upon examination, the claimant was alert, articulate and followed commands. Her *reflexes, motor, and coordination appeared normal,* though it was noted that **there was a mild decrease in sensation to**

light touch on the left. The **diagnosis was "complicated migraine with probable sinusitis component."** Also, there appears to be a **significant alteration of the claimant's regimen of the pain medication regime** (i.e., "(1) ween Esgic down to zero in 2 weeks = schedule given; (2) start Proponalol 10 mg tid—stop Verapamil; and (3) start Trazodone[28] 50 mg-> 100 mg after 4 days, discontinue Pamelor)." [Adm.Rec. 212].

On **July 30, 1996,** the claimant was seen in the clinic for **follow-up "of chronic headaches, most likely migraine,** with other superimposed headaches." [Adm. Rec. 202]. The claimant **complained of many near-syncopal episodes,** *drowsiness* in the morning on Deseryl and easily upset stomach. Her physical examination was normal but *with pain to palpation over temporal areas.* The **diagnosis was "multiple headache types— current dominance of migraine and tension."** Id. The plan was to **try a short course of Indocin[29] and a few Flexeril.[30]** Given the claimant's inability to tolerate the Beta Blocker, the doctor prescribed **Calan SR.**

Claimant returned to the clinic on **October 28, 1996,** presenting symptoms of **"possibly migraine v. chronic tension headaches vs both."** [Adm.Rec. 201]. The claimant reported help from her **Indocin and Flexeril medications but she also experienced upset stomach.** Her head-

28. **Desyrel (Trazodone Hydrochloride)** is indicated for the **treatment of depression.** It reportedly **may enhance the response to barbituates** and other anti-depressants. **Adverse reactions** to the drug include **blurred vision, dizziness, drowsiness, fatigue, impaired memory, nausea** and **decreased appetite,** *inter alia. See* Physician's Desk Reference (PDR), 520–21 (49th ed.1995).

29. **Indocin** is a non-steroidal anti-inflammatory (NSAID) with adverse effects which include **nausea, dyspepsia, and abdominal distress or pain.** PDR 2001, at 1725.

30. **Flexeril (Cyclobenzaprine Hydrochloride)** is indicated for relief skeletal muscle spasm of local origin and is **ineffective for relief of muscle spasm due to central nervous system disease.** The most frequent **adverse reactions** reported with Flexeril were **drowsiness, dry mouth and dizziness. Fatigue, tiredness, nausea and blurred vision** are among the less frequent adverse reaction. *Id.,* at 1702.

ache frequency was 2 to 3 time a week, their intensity was "very bad", and they lasted a few hours and then they would go away. Her medication plan was to continue on **Calan SR** and **change the NSAID to Cataflam (diclofenac potassium).**[31] [Adm.Rec. 201].

On January 14, 1997, claimant was seen with complaints of chronic headaches, which she reports remained about the same. The claimant reported that the Cataflam did not help and she stopped taking it after one month. She had been on a regimen of **Verapamil, Butalbital/Esgic** at onset of headache, and **Pamelor.** According to the claimant, that regimen seemed to work better. Her headaches were about 5 times a month lasting a few hours. Her physical examination was completely normal. The diagnosis was "**chronic headaches—migraine vs tension type.**" [Adm.Rec. 200]. The claimant was maintained on **Verapamil, Butalbital, Pamelor** and she was given an **Esgic refill.**

On **April 8, 1997,** claimant's clinic chart notes that she complained of **headache, dizziness and black-out spells.** Her physical exam was normal. The impression was "**complicated migraine vs. substance abuse vs. TIA** [transient ischemic attacks]." [Adm.Rec. 199].

On **March 1, 1997, the claimant** visited the *emergency room* at Memorial Medical Center complaining of a 3–day migraine headache and nausea. Emergency room physicians administered an injection of **Demerol and Phenergan.** [Adm.Rec. 157–160].

On **May 16, 1997, plaintiff went to the** *emergency room* at MCLNO with a two-week history of body aches and a three-week history of a headache. [Adm.Rec. 195]. An **ultrasound** ordered by Dr. Happel on April 10, 1997 to evaluate the claimant for carotid disease revealed that her examination was **normal.** [Adm.Rec. 176]. Claimant's CT **Scan of the brain** of July 17, 1997 **showed no abnormalities.** [Adm.Rec. 175].

MCLNO chart notes dated **May 30, 1997 indicate that over the period of the prior three months, claimant's appetite had decreased, she had experienced a weight loss of 15 pounds** and nausea, and the **frequency of her headaches had increased.** [Adm.Rec. 188].

Claimant's **June 3, 1997** Neurology Clinic chart note indicated that she was **doing well on her medications which included Verapamil, Nortriptilene, and Butalbital,**[32] and that she was to follow up with Dr. Happel for her CT Scan result. [Adm. Rec. 191].

On **July 15, 1997,** the Neurology Clinic's chart shows that the claimant was seen and **complained of daily headaches, associated with blurred vision and blackouts.** At the time, she complained that she was **never headache free.** Upon **physical examination,** it was noted that claimant had **difficulty heel/toe walking, a decrease in sensation in the left upper extremity.** She was **diagnosed** with "**complicated migraines with left hemiparesis.**" [Adm.Rec. 190]. Claimant was continued on her medications and an EEG and CT Scan was ordered.

---

**31.** **Cataflam** is a non-steroidal anti-inflammatory (NSAID) indicated for acute and chronic symptoms of osteo and rheumatoid arthritis, ankylosing spondylitis, and **management of pain** and primary dysmenorrhea. **Adverse reactions** include **nausea, dizziness, drowsiness,** and **depression,** among other things. *See* PDR 2001, at 836.

**32.** As previously noted, **Butalbital** is the active ingredient in the combination drug product **Esgic Plus** indicated for relief of complex symptoms such as tension headache.

She was again seen in the Neurology Clinic on **September 7, 1997 with complicated headaches exhibiting symptoms of both the tension and vascular genre, with a predominance of tension.** Her physical examination was simply noted as **normal.** The plan **was to try Midrin**[33] **as needed for headaches,** along with **Fiorcet, Verapamil, Pamelor and her regular asthma medications.** [Adm.Rec. 185].

On **November 12, 1997,** claimant visited MCLNO *emergency room* complaining of a week long of sharp shooting pains over temporal regions, as well as a dull headache at the base of her neck—"her usual migraine pattern … [which] begins with nausea, blurry vision, and tingling in the mouth." [Adm.Rec. 181]. It is further noted that she had experienced some facial numbness which was then resolving. Also noted were her **current medications, which then included Verapamil (120mg's), Midrin (2 tabs at onset of headache and thereafter 1 every four hours), Pamelor (50mg's).** Further noted was her complaints of **photophobia and nausea. Physical examination revealed photophobia and a** *slight decrease in sensation over her left cheek.* Otherwise, her physical examination was normal. The **diagnosis was "Migraine with aura (classical migraine)."** *Id.* Emergency room physicians **administered To-**radol[34] IM (intramuscular injection), one dose of 60mg's. A return visit to the Neurology Clinic had been previously scheduled. [Adm.Rec. 181].

On **December 1, 1997,** the Neurology Clinic notes indicated that claimant appeared for **follow up of complicated migraines.** It was further noted that at that time she was **experiencing "mixed headaches,"** some tension and some vascular. [Adm.Rec. 184]. The plan was to **increase her Pamelor medication to 100mg's, a trial of Indocin,**[35] and to **continue with her other medications.** She was scheduled for a follow-up visit on February 23, 1998. [Adm.Rec. 184].

Additional evidence submitted to the Court, consisting of claimant's MCLNO treatment records from January 1998 through September of 1999 reveal continuing treatment of the plaintiff for migraine headaches and her Central City Mental Health Clinic records which similarly chronicle her more recent complaints of migraine headache pain, crying spells, weight loss, dizziness, which clinic started her on Prozac for her depression and reports little improvement in her condition.

### D. Factual Background

Claimant, 38 years old, at the time of decision, testified that she completed high

---

33. **Midrin** is indicated for the **relief of migraine** or tension headaches at onset. Its adverse reactions include transient dizziness. It is a combination drug consisting of a sympathomimetic amine, which acts by constricting dilated cranial and cerebral arterioles and thus, reducing stimuli that lead to vascular headaches. The component, **Dichloralphenazone, is a mild sedative, which reduces the patient's emotional reaction to the pain of both vascular and tension headaches.** Acetaminophen raises the threshold to painful stimuli, thus exerting an analgesic effect against all types of headaches. See PDR 2001, at 1078.

34. **Toradol** is "a potent **NSAID analgesic**" indicated for the **short-term management of moderately severe acute pain that requires analgesia at the opioid level** and "is **NOT indicated for minor** or chronic **painful conditions.**" PDR 1997, at 2789.

35. Indocin is a non-steroidal drug with anti-inflammatory and analgesic properties found effective in relieving the pain and tenderness of moderate to severe rheumatoid arthritis, acute gouty arthritis, etc. PRD 2001, at 1946.

school, and that her last employment was as a packer in a warehouse for about seven years. [Adm.Rec. 70]. Her testimony was that she suffered in the past from asthma but that her claim of disability was primarily due to her migraine headaches, which caused her severe and constant pain. She testified that she is basically a shut-in, and does not socialize.[36] She testified that in addition to the severe pain she experiences on a continuing basis on account of her migraine headaches, her medications make her real drowsy, nauseous, and cause her to sleep a lot.[37]

Margarett Banks, claimant's friend, also testified. Ms. Banks explained that she goes to the claimant's apartment three or four times a week to help with chores. [Adm.Rec. 35]. She further testified that the last time the claimant blacked out, her son called and she came around the block to tend to her. [Adm.Rec. 36]. As to any visible effects of the claimant's medication, Ms. Banks testified that she really could not say, but that the claimant is always in agony and has to lay down before the headache gets terrible. *Id.*

### E. Discussion of the Issues.

#### 1. Subjective Complaints of Disabling Pain

Turning to the issue of the failure of the ALJ to heed claimant's complaints of disabling migraine headache pain, the ALJ candidly admitted that the claimant's impairments were severe and cause her pain. However, the ALJ did *not* define the limits of the claimant's impairments, whether exertional and nonexertional, and determined in a most conclusory fashion that claimant's impairments had little or no impact on her ability to perform a full range of sedentary work.

■ The law of the Fifth Circuit is that pain reaches the level of a disabling complaint when such pain is constant, unremitting, and wholly unresponsive to therapeutic treatment. *Falco v. Shalala,* 27 F.3d 160, 163 (5th Cir.1994).

■■ As to a determination of whether the claimant's pain is disabling, the first consideration is whether the objective medical evidence shows the existence of an impairment which could reasonably be expected to produce the pain alleged. Medical factors which indicate disabling pain include: limitation of range of motion, muscle atrophy, strength deficits, sensory deficits, reflex deficits, weight loss or impairment of general nutrition, noticeable swelling, and muscle spasm.

■ With regard to the claimant's complaints of disabling, unremitting migraine headache pain, the record discloses that neurological testing was normal. Physical examination revealed decreases in sensation on the left side of her cheek and tenderness was noted. The 1997 medical records further disclose that the claimant experienced a decrease in appetite with a charted weight loss of approximately 15 pounds over the period of 2 to 3 months.

As to claimant's complaints of constant migraine headache pain, claimant's medical records chronicle regular visits to the MCLNO's Neurology Clinic for follow-up of her diagnosed migraine/combination headache condition punctuated by visits to Mercy's and MCLNO's emergency room for severe unresponsive headache pain on several occasions. MCLNO's treatment records over the period of several years treatment indicate numerous revisions of her prescription medication regimen, which at all times included drugs indicated

---

**36.** *See* Adm.Rec. at 29–30.

**37.** *Id.,* at 32.

for purposes of prophylaxis, for purposes of migraine headache pain relief/management at onset, and for purposes of either alleviating depression and quite possibly to quell emotional lability secondary to severe headache pain.

The ALJ made no inquiry into the prescription drug regimen ordered by MCLNO's Neurology Clinic and made no mention of same in his decision.

Turning to plaintiff's subjective complaints, she testified that her pain was constant, and was not controlled by her prescription medications. She rated the pain she experiences at the level 8 on a scale of 1 to 10.

The Court notes that subjective complaints of pain may be discounted if there are inconsistencies in the record as a whole. The ALJ rejected the claimant's complaints of disabling pain noting the absence of neurological findings, the fact she sought treatment only sporadically, and the fact that she had not complained of the side effects of her medication to her treating physicians.

There is indeed a paucity of neurological findings in this claimant's case. However, a review of the administrative records indicates continuing and regular treatment at MCLNO's Neurology Clinic, as well as intermittent emergency room treatment, for migraine headaches.

Also, the medical records indicate that the claimant frequently complained of drowsiness, nausea, dizziness, blurred vision, and the like, which could be attributable either to her migraine headache condition and/or a laundry list of controlled drugs prescribed by the claimant's treating neurologists, and taken along with her regular asthma medications.

The ALJ did make mention of two comments in the MCLNO chart on the claimant, as did the Commissioner. In this vein, both noted the parenthetical in claimant's June 18, 1996 MCLNO chart note, following a reference to her continued experience of daily headaches, which reads, "(? suspicion of rebound phenomenon)." [Adm.Rec. 212]. This Court cannot make heads or tails of that comment and the ALJ failed to make any inquiry into the gist or meaning of the passing comment. The Court further notes that the doctor concluded his June 18, 1996 chart entry with a diagnosis of "complicated migraine with probable sinusitis component." There also appears to be a significant alteration of the claimant's regimen of the pain management medication, to wit: "(1) ween Esgic down to zero in 2 weeks = schedule given; (2) start Proponalol 10 mg tid—stop Verapamil; and (3) start Trazodone 50 mg-> 100 mg after 4 days, discontinue Pamelor." [Adm.Rec. 212].

Also, both the Commissioner and the ALJ made mention of a July 26, 1995 MCLNO chart entry diagnosing "classic migraine—significant behavioral component." [Adm.Rec. 95]. Both the ALJ and the Commissioner noted that at that visit in 1995, the claimant reported having 2 to 3 headaches a week, each lasting several hours, which did not interfere with attending class and doing her daily chores. Arguably, the note (i.e., "significant behavioral component") could possibly be construed to indicate that the doctor believed there was some embellishment of the symptoms being reported. However, it is noteworthy that the claimant's prescribed medication regimen included a daily dose of what has been described as a powerful anti-depressant (i.e., Pamelor (Nortriptylene)). Throughout claimant's course of treatment for migraine headaches, physicians at MCLNO Neurology Clinic routinely prescribed psychoactive medication (i.e., Prozac, and then alternated between anti-depressant drugs Pamelor (Nortriptylene)

and Desyrel (Trazodone Hydrochloride)), but always including one psychoactive medication in the mix. It is not clear from the medical evidence at all whether such psychoactive medication was being prescribed by the Neurology Clinic to alleviate depression or for purposes of controlling the claimant's emotional reaction to severe headache pain (i.e., the behavioral component).

In addition to a daily dosage of antidepressant medication, claimant's daily prescription drug regimen included doses of Calan SR (Verapamil Hydrochloride) or Inderal (Propanolol Hydrochloride) for prophylaxis, and Esgic Plus or Midrin plus either Motrin, Indocin, Cataflam or Flexeril or some combination of the foregoing NSAIDs for symptomatic relief at onset of acute migraine headache pain.

The ALJ never initiated any inquiry into the Neurology Clinic's prescribed daily drug therapy, dismissing her treatment by MCLNO Neurology Clinic physicians at the outset as "sporadic" at best.

Claimant's treatment and follow up with MCLNO's Neurology Clinic for her migraine headache condition belies characterization as only "sporadic." As to the ALJ's finding that the claimant failed to complain to her physicians regarding the side effects experienced from prescription medications, the medical records reflect that the claimant complained regularly of side effects including nausea, fatigue, blurred vision, and drowsiness, *inter alia*. Such complaints are noted throughout the history of claimant's treatment and such effects could either be attributed to the migraine headache condition itself or the plan of prescription drug therapy. Neither the complaints nor claimant's drug therapy were addressed in the ALJ's decision. Claimant's MCLNO treatment history, which consists largely of handwritten, illegible, raw data, does not address any effect claimant's prescription drug regimen may have on her ability to function.

■ A claimant's allegations of disabling pain may be discredited by evidence that the claimant has received only minimal medical treatment and/or has taken only occasional pain medications. However, this does not appear to be the case on the face of the medical evidence of record. The ALJ in this case did not inquire further and simply took claimant's medicals at face value. The medical records show repeated and routine visits to MCLNO's Neurology Clinic. Follow up visits were scheduled at the end of each exam. The medical records further indicate that during the pertinent time frame the claimant took numerous prescription medications in combination, on a continuing basis, and most apparently for the purposes of acute and chronic migraine headache pain management, controlling the frequency and duration of such symptoms, and controlling some mental/emotional lability experienced in connection with "classic migraine headaches" and/or complex combination headaches, both vascular and tension.

The ALJ's initial assumption regarding the claimant's subjective complaints of pain being not credible and dismissing out of hand, any possibility that her prescription medication regime may have some affect on the claimant's ability to perform work, resulted in a less than thorough consideration of the underpinnings of claimant's application for benefits. Substantial evidence supports the determination regarding the paucity of objective neurological findings, however, the bare medical record fails to reveal the inconsistencies noted by the ALJ which were utilized to discredit the claimant's complaints of acute chronic pain, and drowsiness and nausea experienced with prescription drug therapy.

There was no inquiry at all regarding the effects of prescription drug medications and there is no medical assessment in that regard in the record, notwithstanding the fact that the claimant complained of side effects which complaints are noted in her treatment records.

There was also no inquiry addressed to the claimant's medical providers regarding any possible causal relationship between the claimant's prescription medications and her reported symptoms of drowsiness, dizziness, nausea, blurry vision, visual disturbances, depression, etc. Claimant's medical records clearly reflect that she both experienced the aforesaid symptoms **and reported them to her treating physicians on numerous occasions.** In fact, the medical record indicates that on certain occasions the claimant's pain management regimen was altered on account of her complaints.

It is noteworthy that dizziness, nausea and fatigue are reported adverse reactions to orally administered Calan SR (Verapamil Hydrochloride),[38] a prescription medication prescribed off and on throughout the history of claimant's treatment by MCLNO's Neurology Clinic. Another drug prescribed by claimant's physicians in the treatment and management of her condition was Inderal (Popranolol Hydrochloride), indicated for the prophylaxis of migraine headaches.[39] Other medications prescribed by physician's of MCLNO's Neurology Clinic which were included in the claimant's routine prescription drug regimen during the pertinent period include Esgic, Midrin, Trazodone, Pamelor, Indocin, Flexeril, Cataflam and Motrin. Adverse reactions to Pamelor include confusional states, numbness, tingling, seizures, and nausea.[40] The most frequently reported adverse reactions to Esgic are drowsiness, dizziness, sedation, nausea and abdominal pain.[41] Adverse reactions to Trazodone include blurred vision, dizziness, drowsiness, fatigue, impaired memory, nausea, decreased appetite.[42] The most frequent side effects complained of with the use of Flexeril are drowsiness and dizziness, whereas, fatigue, tiredness, nausea and blurred vision are among the less frequent.[43] Adverse reactions to the NSAID Cataflam include nausea, dizziness, drowsiness and depression.[44]

▮ The ALJ may not selectively discuss only such evidence which favors his ultimate conclusion. The failure to consider an entire line of evidence conflicts with the obligation of considering all of the evidence. There was no mention of the claimant's regimen of daily prescription drug therapy, her routine ongoing treatment for migraine headaches was characterized as only "sporadic," and much ado was made about the mention of "a significant behavioral component," which in conjunction with Pamelor and/or Trazodone prescriptions, rather supports the claimant's complaints of mental/emotional nonexertional impairment. The cumulative ef-

---

**38.** Such reactions reportedly occur at rates of greater than 1% or at lower rates but appeared clearly drug-related in clinical trials in 4, 954 patients. *See* Physicians' Desk Reference (PDR) 55 Edition 2001, at 2982 (wherein adverse reactions to various Verapamil are discussed in order to alert physicians to possible relationships).

**39.** Adverse reactions to Inderal listed in the PDR include mental depression, weakness, fatigue, nausea, and abdominal cramping. *Id.,* at 3378–79.

**40.** PDR 51 1997, at 2409–10.

**41.** *Id.,* at 1012.

**42.** PDR 49 1995, at 520–21.

**43.** PDR 55 2001, at 1702.

**44.** *Id.,* at 836.

fect of selective acknowledgment of certain evidence which without some explanation is hardly significant and leaving other important segments of claimant's medical treatment and areas of clinical focus unmentioned and/or completely ignored, results in a less than accurate assessment insofar as the claimant's medical picture and credibility is concerned. In evaluating the claimant's testimony and comparing it with prior statements and other evidence, the ALJ selectively ignored claimant's prior statements to treating physicians and other medical evidence which tended to corroborate her hearing testimony.

In short, the ALJ failed to articulate sound reasons for rejecting the plaintiff's complaints of debilitating pain. Particularly considering the concomitant finding that claimant's underlying medical impairment could reasonably be expected to produce the kind of pain she has alleged. [Adm.Rec. 16].

Claimant's alleged symptoms if fully credited after a reasonable inquiry, may significantly inhibit her ability to perform a full range of sedentary work.

### 2. Requirement to Obtain Supplemental Information.

SSR 96–2p admonishes:

[I]n some instances, additional development required by a case—for example to obtain more evidence or to clarify reported clinical signs or laboratory findings—may provide the requisite support for a treating sources medical opinion that at first appeared to be lacking or may reconcile what at first appeared to be an inconsistency between a treating source's medical opinion and the other substantial evidence in the case record....

SSR 96–2p, 61 F.R. at 33491. SSA Regulations 20 C.F.R. § 404.1512(e) provides in pertinent part:

(e) *Recontacting medical sources.*

When the evidence we receive from your treating physician or psychologist or other medical source is inadequate for us to determine whether you are disabled, we will need additional information to reach a determination or decision. To obtain the information, well will take the following actions.

(1) We will first recontact your treating physician or psychologist or other medical source to determine whether the additional information we need is readily available. We will seek additional evidence or clarification from your medical source when the report form your medical source contains a conflict or an ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques....

20 C.F.R. § 404.1512(e). Subsection (d) of § 404.1512 provides in pertinent part:

*Our responsibility.* Before we make a determination that you are not disabled, we will develop your complete medical history for at least the 12 months preceding the month in which you file your application unless there is a reason to believe that development of an earlier period is necessary or unless you say that your disability began less than 12 months before you filed your application. We will make every reasonable effort to help you get medical reports from your own medical sources when you give us permission to request the reports.

20 C.F.R. § 404.1512(d).

■ In addition to the applicable regulations, the Fifth Circuit also imposes a duty on the ALJ " 'to develop the facts fully and fairly relating to an applicant's

claim for disability benefits." ' [45] The ALJ in this case, faced with an incomplete medical analysis, failed to obtain supplemental information, and instead, made medical determinations as to the claimant's physical and mental limitations, and on that basis assessed the claimant able to perform sedentary work across the board. The ALJ's finding regarding the claimant's residual functional capacity over the period at issue in this case (i.e., 1995—1998) is not predicated on a meaningful analysis of the raw data contained in the MCLNO Neurology Clinic's treatment records on the claimant.

The Court here notes that notwithstanding the fact that the claimant was treated for her diagnosed migraine/complex headache condition with significant behavioral component by her physicians at MCLNO's Neurology Clinic with psychoactive drugs, Pamelor and Trazodone, both anti-depressants, throughout the entirety of the pertinent time frame, the ALJ made a factual finding directly to the opposite effect, to wit: "I further find that the record contains no evidence that the claimant has been diagnosed with, or was treated for, any mental or emotional impairment for the period beginning October 26, 1995 and continuing through the date of this decision." [Adm.Rec. 18].

The Commissioner discerns a great deal of significance from the fact the claimant's treatment records contain no assessment of her limitations or restrictions, and/or failed to mention any such restrictions. However, claimant's ability to work never surfaced as an issue throughout her medical treatment at MCLNO's Neurology Clinic during the pertinent time frame.

■ The Court recognizes that the absence of such opinions may be relevant and proper for consideration in certain circumstances, though not conclusive in weight. In such circumstances where a claimant has not been diagnosed with a medically determinable condition which could reasonably cause the severe symptoms alleged, the fact that none of the physicians were specifically asked to render such an opinion, would not necessarily vitiate the evidentiary inference. However, in the case at bar, all of the claimant's treating physicians described the claimant's complex migraine headache condition in severe terms, and ordered serious prescription medications aimed at prophylaxis and relief of acute migraine headache pain at onset, along with a daily dosage of psychoactive medication. There was no countervailing medical opinions regarding either their diagnoses or the severity of claimant's condition. Their were no consults were ordered and no inquiries made with claimant's treating physicians. Also, the claimant had not worked for years, and thus, claimant's physicians had no reason to believe any advice regarding limitations and/or restrictions with respect to working and/or working conditions, if any existed, were warranted in this patient's case.

This is a case involving a complete absence of any medical basis for the ALJ's functional assessment. The claimant was not sent for a consultative examination and there was no inquiry made with the claimant's treating physicians. The record contains no physician's opinion or other medical evidence addressing either any exertional or nonexertional limitations associated with the claimant's diagnosed classic migraine headaches/combination headaches. The medical evidence of record completely fails to address any limitations which might obtain either in connec-

---

**45.** *Newton v. Apfel,* 209 F.3d 448, 458 (5th Cir.2000) *(citing Ripley,* 67 F.3d at 557 for the proposition that "if the ALJ does not satisfy his duty, his decision is not substantially justified.").

tion with the claimant's impairment or in connection with the prescribed drug therapy.

Under the regulations, the Commissioner is required to consider the "type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate [ ] pain or other symptoms".[46] That was not done in this case and the Commissioner is bound by the applicable regulations.

### 3. Residual Functional Capacity and Reliance on "Grid Rules."

■ Claimant contends that the it was error to rely exclusively on the Medical–Vocational Guidelines [47] in determining whether she was disabled. Use of "Grid Rules" is appropriate when it is established that the claimant suffers only from exertional impairments, or that the claimant's nonexertional impairments [48] do not significantly affect his residual functional capacity.[49] *See Crowley*, 197 F.3d at 199.

■ In this case, the ALJ undertook the prescribed five step analysis and found that the claimant satisfied the first four steps. More specifically, the ALJ determined that: (1) claimant has not engaged in substantial gainful activity since October 25, 1995, the date she filed her SSI application;[50] (2) she has a severe chronic headaches and a history of abdominal pain (i.e., an underlying medically determinable impairment which could reasonably cause the symptoms alleged);[51] (3) these impairments did not meet the level of severity of any impairment contained in Appendix I;[52] and (4) the impairments nevertheless prevented her from performing her past relevant work.[53] The ALJ recognized that it was the Commissioner's burden to demonstrate that the claimant had retained the functional capacity to perform a full range of sedentary work, and found both that the Commissioner met this burden, and that the grids applied to preclude a finding of disability.[54]

In the case at bar, the ALJ specifically found that the claimant "has an impairment which could reasonably be expected to produce the type of pain she has alleged" and recognized that the "pain causes some functional limitations."

---

**46.** 20 C.F.R. § 404.1529(c)(3)(iv); *see also Crowley v. Apfel*, 197 F.3d 194, 199 (5th Cir. 1999).

**47.** The medical-vocational grid at 20 C.F.R. pt. 404, subpt. P, app. 2, measures whether a person is disabled based on his or her age, education, and work experience.

**48.** An "exertional" limitation is a limitation or restriction imposed by the claimant's impairments and related symptoms, such as pain, which affect her ability to meet the strength demands of a job. 20 C.F.R. § 404.1569a(a). Such limitations determine whether a claimant can only perform, for example, sedentary work. A "nonexertional" limitation is one imposed by the claimant's impairments and related symptoms, which affect her ability to meet the non-strength demands of a job, and includes manipulative impairments and pain. 20 C.F.R. § 404.1569a(c)(1).

**49.** Residual functional capacity (RFC) is a measure of what the claimant can still do despite his limitations. 20 C.F.R. § 404.1545(a). It is an assessment "based upon all of the relevant evidence" including the claimant's own descriptions of limitations that go beyond the symptoms of the impairment, such as pain, observations of treating/examining physicians, including medical records; and observations by other relevant witnesses. *Id.*

**50.** Adm.Rec. at 11.

**51.** *Id.*

**52.** *Id.*

**53.** *Id.*, at 19.

**54.** *Id.*

[Adm.Rec. at 16]. Claimant's counsel correctly notes that the ALJ never characterized the claimant's functional limitations as either exertional or nonexertional, or a combination of the two. It is safe, however, to assume the ALJ concluded that she had nonexertional limitations of some measure in light of the fact of the acknowledgement that the claimant experiences some pain on account her impairment, which impairment the ALJ determined to be severe.

The ALJ did find that the claimant was not fully credible in her testimony that she was unable to engage in any work activity on account of her headache pain, drowsiness and nausea, and not fully credible in that the claimant exaggerated the nature and severity of her pain. [Adm.Rec. 17]. The ALJ then concluded summarily, that the claimant had the residual functional capacity to perform the exertional and nonexertional requirements of work activity consistent with sedentary work and that the claimant failed to establish any *significant* restriction in her capacity to perform such work. [Adm.Rec. 17 and 19].

Because the Court has concluded that the ALJ's findings with respect to the claimant's experience of adverse side effects associated with her prescription drug medications and with respect to the claimant's credibility lacked an important predicate, the Court must likewise conclude that exclusive reliance on the "Grid Rules" was inappropriate.

Whether exertional or nonexertional, the limiting effects, if any, in connection with the claimant's medical treatment/prescription drug therapy were not considered at step five of the analysis. Neither the ALJ nor this Court is permitted to presume or speculate that the claimant's prescriptions medications for acute and chronic migraine/complex headache condition had either significant, moderate, or no effect on the claimant's RFC. "The adjudicator must consider all allegations of physical and mental limitations or restrictions and **make every reasonable effort to ensure the file contains sufficient evidence to assess RFC.**" Social Security Ruling 96–8p. The ALJ is bound by the agency's rulings. *See* 20 C.F.R. § 402.35(b)(1).

There was no evidence in the record from which the ALJ could properly conclude that there were no significant nonexertional effects from the prescription drugs regimen ordered by the claimant's physicians as continuing and ongoing treatment of her diagnosed complex migraine headache condition, whether accompanied by "a significant behavioral component" or not.

The ALJ rejected Francois' claims of any significant nonexertional impairment, however, concluding that they were not credible. While the ALJ's assessment of the claimant's credibility is accorded great deference, the record as it is presently constituted, lacks medical findings on which to predicate findings regarding the extent of the claimant's nonexertional impairment[s].

The Fifth Circuit has held that if an individual's medical treatment [which would includes drug therapy] significantly interrupts the ability to perform a normal, eight-hour work day, then the ALJ must determine whether the effect of treatment precludes the claimant from engaging in gainful activity. *See Newton v. Apfel,* 209 F.3d 448, 459 (5th Cir.2000). While the claimant in the case at bar did not require daily/weekly visits to the doctor and hospital, she was seen routinely and on a continuing basis by MCLNO's Neurology Clinic for her condition, on an emergency basis by both Mercy and MCLNO on occasion, and various drug therapy was prescribed for both on a daily basis and as

needed between appointments. The claimant testified at the hearing and complained to her treating physicians of drowsiness, blurred vision, nausea, etc., all of which may or may not be attributable to her drug therapy. The ALJ neither scheduled a consult nor addressed any inquiry to claimant's treating physicians in this vein.

 It is well-established that pain, even if not disabling, may constitute a nonexertional factor that limits the range of jobs an applicant can perform. *Lawler v. Heckler*, 761 F.2d 195, 198 n. 3 (5th Cir.1985). Moreover, when determining that the claimant can perform a given type of work, "the ALJ must find that the applicant can meet the job's exertional requirements on a sustained basis." *Carter v. Heckler*, 712 F.2d 137, 142 (5th Cir. 1983). If the claimant cannot perform his past work and suffers nonexertional impairments that prevents him from performing the full range of other available work, the Secretary must produce expert vocational testimony or similar evidence to establish that jobs exist in the national economy that the claimant can perform. *Id.*

 In light of the shifted burden of proof in this case and the fact that Francois did indeed, experience pain, it was incumbent on the ALJ to consider Francois pain and drug therapy as a possible factors limiting the type of work she could perform. *See Lawler*, 761 F.2d at 198 n. 3. The fact that the ALJ rejected Francois' complaints that her migraine headache pain severely limited her ability function does not mean that the claims should be totally disregarded.

To recap, the ALJ did find that the claimant experienced some pain traceable to objective medical evidence as revealed by the diagnoses of "classic migraine with aura", combination migraine/tension headaches, etc., and for which impairment anti-inflammatory, pain, prophylactic and anti-depressant medications were prescribed on a regular basis. He further found that her medically determinable condition could reasonably cause the symptoms alleged.

Under the Secretary's interpretive guidelines, once a medically determinable physical impairment is documented, the effects of pain must be considered *at each step* of the sequential process. *See* SSR 88–13. When evaluating the claimant's complaints at step five, the ALJ must give full consideration to all of the available evidence, medical and other, that reflects on the impairment[s] and any attendant limitations of function. The RFC assessment must describe the relationship between the medically determinable impairment[s] and the conclusions of RFC which have been derived. While an ALJ has the discretion to evaluate credibility and to arrive at an independent judgment regarding pain as well as the duty to ultimately determine disability on the basis of the claimant's RFC to engage in gainful employment, such must be accomplished in the light of medical findings and other evidence bearing on the true extent of the pain and other limitations alleged.

It is apparent to the Court that the ALJ did not consider any nonexertional limitation on account any mental or emotional condition from which the claimant may be suffering. The ALJ explained that record revealed a complete absence of any evidence of diagnosis or treatment for such impairments. The Court previously observed that the medical record reveals that the claimant was prescribed anti-depressant drugs by her treating physicians at MCLNO's Neurology Clinic for some undisclosed purpose throughout the pertinent time frame (*i.e.*, a daily dosage of varying quantities of either Prozac, Pamelor or Trazodone, all of which are psychoactive anti-depressant prescription medications).

The record as it is presently constituted would not support a factual finding that the claimant's mental or emotional condition was neither the focus of any medical attention and/or was of no clinical significance.

If it should be determined on remand that any nonexertional limitations of mental and/or emotional etiology were present during the pertinent time frame and not merely a slight abnormality of minimal effect on claimant's ability to work, the ALJ's reliance on Grid Rules at the fifth level would constitute error. *Newton*, 209 F.3d at 454.

Accordingly, and for the foregoing reasons the Court **REMANDS this action for further consideration consistent with the opinions expressed herein.**

**IT IS ORDERED** that claimant's Motion for Summary Judgment is GRANTED, *but only insofar as it seeks REMAND.*

**IT IS FURTHER ORDERED** that the Commissioner's Cross–Motion for Summary Judgment is **DENIED.**

**IT IS FURTHER ORDERED** that the captioned matter is **REMANDED for further consideration of Francois' claim consistent with opinions expressed herein above.** This remand is pursuant to sentence 6 of § 405(g).